EAGLE HILL CORPORATION *v.* COMMISSION ON
HOSPITALS AND HEALTH CARE
(2422)

DANNEHY, C.P.J., TESTO and BORDEN, Js.

Argued March 6—decision released May 29, 1984

*Thomas J. Ring,* assistant attorney general, with whom were *Paul J. Lahey,* assistant attorney general, and, on the brief, *Joseph I. Lieberman,* attorney general, *Richard J. Lynch, Jane S. Scholl* and *Bernard F. McGovern,* assistant attorneys general, for the appellant (defendant).

*Robert B. Titus,* with whom, on the brief, were *J. Charles Mokriski* and *Linda M. Wilder-Curtis,* for the appellee (plaintiff).

BORDEN, J. The defendant commission on hospitals and health care appeals[1] from the judgment of the trial court modifying a decision of the commission which denied a major part of a capital expenditure increase sought by the plaintiff, Eagle Hill Corporation (Eagle Hill). Eagle Hill operates an alcoholism treatment facility in Newtown.

The commission, after a hearing, found the following facts. On September 11, 1976, the commission approved Eagle Hill's request to construct the facility, providing a mix of fifty-six acute, intensive and intermediate care beds, at a cost not to exceed $2,700,441. In the fall of 1978, Eagle Hill applied for and on January 9, 1979, the commission approved a capital expenditure increase of $1,594,559, bringing the total approved cost to $4,295,000. This increase was made necessary by the inflationary effect of delays and by building standards, applicable to Eagle Hill, developed by the federal department of housing and urban development, which was financing the construction of the facility. At that time Eagle Hill projected a per diem patient rate of $114.

On February 6, 1980, Eagle Hill applied to the commission for approval of initial rates of $127 per day. On February 15, 1980, the staff of the commission responded that the requested rate was based on a rental expense[2] which was inconsistent with rental information previously filed. On February 19, 1980, Eagle Hill explained that the new rental expense was based on a capital cost at least $351,000 higher than the

---

[1] This appeal, originally filed in the Supreme Court, was transferred to this court. Public Acts, Spec. Sess., June, 1983, No. 83-29, § 2 (c). The Supreme Court had granted the defendant's petition for certification. See General Statutes (Rev. to 1981) § 51-197b, now repealed.

[2] Eagle Hill operates the facility on land and buildings owned by a limited partnership, an arrangement approved by the commission.

$4,295,000 approved, due to certain cost overruns during construction.

In February, 1980, Eagle Hill had indicated that it would begin to operate on April 1, 1980, but had not yet obtained the required local zoning and building approvals. On March 25, 1980, the commission, finding that Eagle Hill had not timely submitted its rate application, denied the proposed initial rate and ordered a hearing to address both the cost overruns and the per diem rate. On April 8, 1980, Eagle Hill informed the commission that the cost overruns, previously indicated at $351,000, were in fact $555,000, plus an additional $96,500 for relocation of offices required by local zoning authorities for which it planned to request approval.

A first hearing was held on April 15, 1980, on Eagle Hill's application for initial rates and approval of cost overruns. This application requested rates of $130 per day, and at the hearing Eagle Hill increased its cost overrun estimate to $705,358, which included $101,720 for increased financing costs and $96,500 for offices. After the hearing Eagle Hill withdrew this application.

On April 23, 1980, Eagle Hill submitted a new application, which generated the hearing leading to the commission's decision in this case. Eagle Hill requested approval of a total increased capital expenditure of $705,036, which included a more precise estimate of the office relocation cost. On April 30, 1980, Eagle Hill requested a per diem rate of $133.50. Eagle Hill broke down the cost overrun figure into three general categories: increased construction costs, consisting of six subcategories, totaling $557,340; additional recreation area work costs totaling $45,976; and additional financing costs of $101,720.

The increased construction costs consisted of the following. (1) $152,131 for excavation and removal of ledge and bedrock which was not disclosed by a precon-

struction soil survey; (2) $113,015 for changes in four buildings resulting from price increases, improvements for operating efficiency, changes required by safety codes, environmental improvements, and changes required by local authorities because of square footage increases made by Eagle Hill; (3) $34,006 for lighting and other electrical changes required because of the inadequacy of the original lighting plan; (4) $93,690 for wells and changes in specifications for the pumping house required because of inadequacies in the original design; (5) $68,320 for site work changes required because of errors in the original site plan; and (6) $96,178 for relocation of the corporate offices required because, after securing local approval, Eagle Hill made internal square footage changes of which the local authorities did not approve. The increased cost for additional recreation areas was required because of errors in the original plan. The additional financing cost, which would be incurred when additional funds were borrowed, resulted from increased debt to finance the other increases.

The construction change orders involved here began to accumulate in July, 1979, and had been approved by Eagle Hill's architect, contractor and other personnel without any tallying of their sum. Between January, 1979, when the commission approved Eagle Hill's first increase, and February 19, 1980, when Eagle Hill first explained its increased rental expense, Eagle Hill did not notify the commission of any cost overruns. This was because Eagle Hill was unaware of the amount of those overruns. The cost of completing the remaining construction work as of May 15, 1980, was $63,920. Excluding the $101,720 in additional financing costs which had not yet been incurred, this left a total of $539,396 spent or committed by Eagle Hill without the commission's approval, which was equivalent to an additional per diem patient expense of $4.25. Eagle Hill

has made no attempt to recover any costs flowing from original plan inadequacies for which architects and engineers were responsible. The construction project was inefficiently managed and monitored. There is no evidence that Eagle Hill attempted to identify nonessential items or areas for reduction or elimination so as to compensate for cost increases and thus to maintain the overall cost within the previously approved amount.

The commission concluded as follows. Eagle Hill failed to submit its request for approval of the $705,036 capital expenditure ninety days prior to its initiation date as required by then General Statutes (Rev. to 1979) § 19-73m.[3] Because of this failure coupled with Eagle

---

[3] General Statutes (Rev. to 1979) § 19-73m, which has now been replaced by General Statutes § 19a-155, then read as follows: "REQUESTS FOR APPROVAL OF CAPITAL EXPENDITURES OF ONE HUNDRED THOUSAND DOLLARS OR MORE. (a) Any health care facility or institution and any state health care facility or institution proposing a capital expenditure of one hundred thousand dollars or more, including the leasing of equipment or a facility, which expenditure was not included in a budget approved under section 19-73o, shall submit a request for approval of such expenditure to the commission, with such data, information and plans as the commission requires, ninety days in advance of the proposed initiation date of such project. The commission shall thereupon hold a public hearing with respect to such request, at least two weeks' notice of which shall be given to the facility or institution by certified mail and to the public by publication in a newspaper having a circulation in the area served by the facility or institution. Such hearing shall be held at the discretion of the commission in Hartford or in the area so served. The commission shall consider such request in relation to the community or regional need for such capital program, the possible effect on the operating costs of the health care facility or institution, the recommendations of the Health Systems Agency regarding such proposal, and such other relevant factors as the commission deems necessary. Except as permitted in subsection (b), within ninety days after receiving such request, and such data as it may require, the commission shall either approve, modify or deny such request, or make a finding of recommendations based upon the said request. Upon a showing by such facility or institution that the need for such capital program is of an emergency nature, the commission may waive the requirement that the request be submitted ninety days in advance of the proposed initiation date of the project and that a public hearing be held thereon, provided such request shall be sub-

Hill's failure to attempt to control costs, the commission determined that that portion of the request which was spent prior to or during the filing of the application, which was $539,396, should be denied.[4] In addition, the commission attached four conditions to its approval.

Eagle Hill appealed, on several grounds, to the Superior Court under then General Statutes (Rev. to 1979) § 19-73p (now General Statutes § 19a-158) and General Statutes § 4-183, which is part of the Uniform Administrative Procedure Act (UAPA). The court held that the commission had misconstrued § 19-73m; that its decision constituted a per se rule in violation of the UAPA; that the disapproved funds be approved and restored to Eagle Hill's capital budget; and that the four conditions imposed by the commission be deleted as invalid. This appeal by the commission followed.

I

General Statutes (Rev. to 1979) § 19-73m, applicable to this case, provided in pertinent part as follows: "Any health care facility . . . proposing a capital expenditure of one hundred thousand dollars or more . . . which expenditure was not included in a budget approved under section 19-73o, shall submit a request for approval of such expenditure to the commission . . . ninety days in advance of the proposed initiation date of such project." The court held, as Eagle Hill urges us to hold, that the "initiation date of such proj-

---

mitted at least ten days before such date. (b) The commission shall grant or deny such request within ninety days or ten days, as the case may be, of receipt thereof, except that such ninety day period may be extended for an additional thirty days by mutual agreement of the facility or institution and the commission. Failure of the commission to act thereon within such period shall be deemed approval of such request."

[4] The unexpended $63,920 to complete construction and the $101,720 for additional financing, for a total of $165,640, was approved. That portion of the requested per diem rate attributable to $539,396, or $4.25, was disapproved. Thus, a daily rate of $129.25 was approved.

ect," as applied to these facts, refers to the initial approval by the commission, in 1976, of Eagle Hill's request to construct the facility at a cost not to exceed $2,700,441, and does not apply to cost overruns occurring in 1979 and 1980. We agree with the commission that the phrase, "the proposed initiation date of such project," refers instead to the proposed date of any capital expenditure of $100,000 or more not previously approved by the commission.

"Project" means, generally, a specific plan or design; a planned undertaking. Webster, Third New International Dictionary. The use of the word "such" in grammatical usage refers to the last antecedent. *LaProvidenza* v. *State Employees' Retirement Commission,* 178 Conn. 23, 27, 420 A.2d 905 (1979). Textually, then, "the proposed initiation date of such project" refers back to the planned capital expenditure. This reading is buttressed by reference to the legislative history of the statute, which makes clear that it was the purpose of the legislature to lodge in the commission power over major capital expenditures in order to control spiraling health care costs. See 16 H.R. Proc., Pt. 5, 1973 Sess., pp. 2100, 2134–35.

A statute is to be construed so that all its parts have meaning; *State* v. *Turello,* 183 Conn. 330, 336, 439 A.2d 364 (1981); so that it makes common sense; *State* v. *Privitera,* 1 Conn. App. 709, 721, 476 A.2d 605 (1984); and so that it does not lead to bizarre results. *Connecticut Natural Gas Corporation* v. *DPUC,* 1 Conn. App. 1, 4, 467 A.2d 679 (1983). The statutory construction urged by Eagle Hill would leave the word "such" without a textual antecedent. It would also mean that once a health care construction project was approved, later major changes, even those, for example, involving new and different buildings, would be beyond the commission's scrutiny. Indeed, under this reading, Eagle Hill's application in 1978 for approval of a more than $1.5

million increase would have been unnecessary. We do not think that the legislature intended such an uncommon-sensible and bizarre result.

The commission argues that its decision did not amount to the promulgation of a regulation in violation of the UAPA. We agree. Whether administrative action is a regulation does not depend on the label the agency attaches to it or on the procedure giving rise to it. *Walker* v. *Commissioner,* 187 Conn. 458, 462, 446 A.2d 822 (1982). "The test is, rather, whether 'a rule has a substantial impact on the rights and obligations of parties who may appear before the agency in the future.' " Id., quoting *Maloney* v. *Pac,* 183 Conn. 313, 326, 439 A.2d 349 (1981).

This does not mean, however, that every administrative decision which may have precedential significance beyond the facts and party before it becomes ipso facto a regulation. Like courts, "administrative agencies must necessarily interpret statutes which are made for their guidance. To rule otherwise would be to ignore the subtle and intricate interaction of law and fact. It is inherent in our judicial system of dispute resolution that the interpretation of statutes, like the development of the common law, grows out of the filtering of a set of facts through the law, as seen by the administrator or judge." *Connecticut Life & Health Ins. Guaranty Assn.* v. *Jackson,* 173 Conn. 352, 356–57, 377 A.2d 1099 (1977). In deciding whether administrative action amounted to a regulation, a reviewing court must look to what the agency in fact did in a particular case and how it did it. *Salmon Brook Convalescent Home* v. *Commission on Hospitals & Health Care,* 177 Conn. 356, 362, 417 A.2d 358 (1979).

A careful reading of the commission's decision discloses that it did not rule that in every case of a capital expenditure of $100,000 or more made without the

statutory advance notice, the expenditure must be disallowed.[5] It did not base its decision solely on the lack of prior notice to it; nor did it follow a previously adopted rule or policy of general applicability. Cf. *Walker* v. *Commissioner,* supra; *Salmon Brook Convalescent Home* v. *Commission on Hospital & Health Care,* supra. Rather, it denied the major portion of the request because, in its language, the request "was submitted in a manner which precluded the Commission from making an appropriate review and because the evidence reflected that, in spite of prior difficulties with the cost of this project, the applicant made little attempt to control project cost . . . ." The commission specifically supported its reference to Eagle Hill's absence of cost control with three salient facts: the lack of Eagle Hill's attempt to recover damages from parties responsible for a series of inadequate initial plans; Eagle Hill's inefficient management and monitoring of the project, evidenced by the fact that there had already been one, approved major cost overrun followed by a sorry series of further cost increases which Eagle Hill could not even calculate correctly without repeated prodding by the commission; and the lack of evidence that Eagle Hill attempted to identify any items for reduction or elimination in order to compensate for those cost increases. Thus, the commission focused both on the language of the statute and on its major purpose, to control costs. The commission was doing its duty. It was interpreting the statute, which was enacted for its guidance and which it was charged with administering, by "the filtering of a set of facts through the law . . . ." *Connecticut Life & Health Ins. Guaranty Assn.* v. *Jackson,* supra, 357. It did not engage in regulation-making.

---

[5] Indeed, here it approved a total of $165,640 of Eagle Hill's request, which amount was, although not yet spent, clearly committed and which was directly linked to the disapproved portion. See footnote 4, supra.

Eagle Hill argues in effect that the statute is silent on the issue of cost overruns during construction, that the commission should have promulgated regulations on that issue, and that its failure to do so compels the conclusion that its decision here amounted to such a regulation. We disagree. Although the commission could have promulgated and could now promulgate such regulations, and although the statute may not specifically mention such expenses, that did not deprive the commission of its administrative function of applying the general language of the statute to the facts of this case. "[A] statute cannot be read in a vacuum but must be illuminated by the force of concrete, everyday pressures." *Connecticut Life & Health Ins. Guaranty Assn.* v. *Jackson,* supra.

Eagle Hill also argues that a common sense construction of the statute supports its position, because in the course of any construction project it is frequently necessary to make change orders which cannot be feasibly handled by separate applications and hearings under General Statutes (Rev. to 1979) § 19-73m. We do not think that the statutory scheme required Eagle Hill to make the Hobson's choice between such a procedure and the course of inaction it followed here. It had a spectrum of choices open to it. It could have, for example, simply communicated with the commission and kept it informed of the difficulties, thus opening an avenue of informal, mutual consultation. We see nothing in the statute or in administrative law or practice which would bar such a process. See, e.g., *Lahey Clinic Foundation, Inc.* v. *Health Facilities Appeals Board,* 376 Mass. 359, 380 N.E.2d 675 (1978). More formally, it could have, for example, petitioned for a declaratory ruling from the commission, which petition requires a "prompt disposition"; General Statutes § 4-176; or it could have requested, as provided for in § 19-73m, a reduction in the ninety day period to ten days and a waiver of the requirement of a public hearing.

The case of *Lahey Clinic Foundation, Inc.* v. *Health Facilities Appeals Board,* supra, on which Eagle Hill relies, is inapposite. In ruling that "nothing in the statute [requiring approval of a capital expenditure exceeding $100,000] applied that figure to a change in an approved project," the Massachusetts court stated: "Where, as here, the increased cost of a multimillion dollar project results mainly from inflation, refinement of estimates, and financing costs, such application would be entirely inappropriate." Id., 374. This record is simply not comparable. The Massachusetts statutory scheme applicable to that project provided for initial cost estimates, not, as here, actual costs. Furthermore, the cost increases denied in this case did not result mainly from inflation or refinement of estimates, but mainly from changes made by Eagle Hill; and the portion of Eagle Hill's cost increase resulting from increased financing costs was approved.

Our conclusion that there was error does not, however, dispose of the case. Eagle Hill's appeal to the trial court asserted three grounds of commission illegality: that the commission summarily refused to consider the reasonableness and necessity of Eagle Hill's expenditures; that the commission made several critical legal errors and factual findings which are not supported by the evidence; and that the commission failed to give advance notice of the standards it would apply to the application, in violation of the UAPA and of both the federal and state due process clauses. We read the trial court's decision as being based on a combination of the first and third grounds. The trial court did not reach the second ground. We, therefore, remand the case for litigation of that issue. Thus, it is unnecessary for us to reach the commission's other claim in this court, namely that the trial court erred in restoring the funds rather than simply sustaining the appeal and remanding the case to the commission for administrative action.

See *Feinson* v. *Conservation Commission,* 180 Conn. 421, 429–30, 429 A.2d 910 (1980); *Arterburn Convalescent Home* v. *Commission on State Payments to Hospitals,* 176 Conn. 82, 86, 405 A.2d 48 (1978).

## II

The commission also claims that the court erred in deleting the four conditions imposed by the commission. We regard the first two of those conditions as valid and the second two as invalid.[6]

The first condition requires Eagle Hill to submit to the commission its annual operating and capital budgets upon the earlier of an attainment of a ninety percent occupancy level or the end of its first year of operation. The second requires Eagle Hill to submit to the commission, for review, its annual operating and capital budgets for the first six years of operation to ascertain the effect of changes in bed mix[7] and of the unapproved cost overruns. The commission based both of these conditions on General Statutes (Rev. to 1979) § 19-73*o* (now General Statutes § 19a-156) then in effect, which requires, inter alia, any health care facility, upon 180 days notice by the commission, to "submit annually to the commission its proposed operating and capital expenditures budget for its next fiscal year at least ninety days prior to the proposed adoption date of such budget." Here, the commission has given Eagle Hill more than the required 180 days notice. Since the com-

---

[6] We reject Eagle Hill's argument that the commission had no authority under General Statutes (Rev. to 1979) § 19-73m to impose any conditions on its approval. We regard the imposition of reasonable conditions, rooted in the commission's regulatory authority, as within the language of § 19-73m authorizing it to "approve, modify or deny such request, or make a finding of recommendations based upon the said request." See also General Statutes § 19a-155, the statutory progeny of § 19-73m, which explicitly recognizes the power of the commission to impose conditions.

[7] During the hearings it was disclosed that Eagle Hill had not yet secured local zoning approval of the particular bed mix of services to be rendered which the commission had approved. That mix is not an issue in this appeal.

mission could have annually requested such a submission by Eagle Hill, under the facts of this case the commission was within its administrative power to require such submissions in advance. The trial court was in error in deleting these two conditions.

The third and fourth conditions require Eagle Hill to report, within one business day, *any* additional changes in estimated capital cost beyond the $705,036, and prohibit Eagle Hill from making *any* additional changes in the facility's scope, cost or services without the commission's prior approval. We find no statutory or administrative justification for these conditions, which appear to stretch administrative oversight into punishment. There was no error in the deletion of these two conditions.

There is error in part, the judgment is set aside and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other judges concurred.