[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR CONTEMPT
The plaintiff has moved that the court find the defendants CT Page 2182 in violation of a temporary injunction issued by this court on an earlier date.
The defendants are the owners of several residential apartment complexes. The plaintiff is a non-franchised satellite cable systems operator. The parties or their predecessors had entered into private cable system agreements in 1984 under which the plaintiff was granted the exclusive right to install cable television systems in the complexes and supply cable television programs to tenants in the complexes for fifteen years in return for payment of percentage royalty.
The defendants, at some point, claimed that the plaintiff was in breach of its agreements in several respects. This action was commenced by the plaintiff seeking a declaratory judgment that the plaintiff was not in default under the agreements and that the plaintiff had a right to assign its agreements to others, as well as for permanent injunctions restraining the defendants from preventing the assignment and sale of the systems.
In April, 1989, this court, after a hearing, issued a temporary injunction, to wit:
 ORDERED that a temporary injunction issue to restrain the Defendants, Vernon Associates Limited Partnership, Woodgate at Enfield Limited Partnership and Woodgate II Limited Partnership from physically interfering with the Plaintiffs' operation of the cable service at the following three locations, Vernon Associates, 1468 Enfield Street, Enfield, Connecticut; Woodgate at Enfield, 1468 Enfield Street, Enfield, Connecticut; and Woodgate II, 1468 Enfield Street, Enfield, Connecticut and, also to restrain the Defendants from affirmatively interfering with the Plaintiffs' efforts to refinance or to assign their interests in the cable systems at the Defendants' properties, while granting the Defendants the right to inform any assignee or financing organization that approaches them that they feel that the plaintiffs have defaulted in service and that there is a pending action with regard to that. The Defendants are further enjoined from interfering in any manner with the business opportunities of the Plaintiffs.
The thrust of the injunction was to prevent the defendants from interfering with the refinancing or sale of the systems which had been installed in the complexes and from interfering with the assignment of the contracts to the purchaser. Secondarily, a purpose was to prevent the defendants from CT Page 2183 physically removing or interfering with the installed systems.
Now the plaintiff appears asking the court to find the defendants in contempt of that order.
The gist of the allegations of contempt are:
1. That the defendants have entered into an agreement with Continental Cable, a franchised Community Antenna Television Company, to supply cable television to the apartment complexes and thus diminishing the value of the plaintiff's system;
2. That the defendants have allowed Continental to install elements of its system within the exclusive easement granted to the plaintiff under the agreements, reducing the salability of the plaintiff's system;
3. That the defendants had interfered with the plaintiff's ability to refinance or sell the system both by allowing Continental to install a competing system within the easement and to "overbuild" its system on the plaintiff's raising a probability of degradation of the signal and physically interfering with the plaintiff's signal, as well as refusing to allow plaintiff's repair or maintenance agents on the premises without substantial advance notice;
4. That the defendants refused to sign consent to assignment letters required by plaintiff's refinancing lender, although having signed similar letters in the past.
 I.
The basic complaint of the plaintiff is that the defendants have permitted a franchised cable company, Continental Cable, to enter onto the premises and to install a cable wiring and other elements of a cable television distribution system within the complexes and within its easements, thus in effect, substantially diminishing, if not destroying, the value of AMSAT's systems as financing assets and the systems' assignment or sales value. This is because such "overbuilding" would result in two systems attempting to service a limited customer base, impacting on the value of the AMSAT systems as investment. Moreover, the installation would result in signal degradation and interference with AMSAT's ability to service its customers.
The evidence indicated that AMSAT had been interested in selling its system at Woodgate. One of the parties with whom Richard Perrone, the president of AMSAT, had been negotiating was Continental Cable. Perrone had been negotiating with Continental for the sale of the system for a purchase price of CT Page 2184 between $200,000 to $275,000. When P. Gerald DeSimone, the principal operating partner of the Woodgate complexes, indicated he would be willing to substitute Continental Cable as the cable system to service the Woodgate apartments for a premium of $800.00 per subscriber or when Continental offered Woodgate a premium of $800.00 per subscriber, that deal fell apart. It was then that the defendants allowed Continental to install its system. Also, Perrone testified that he had been negotiating the sale of the Woodgate system to Telemedia, another cable company, which deal soured once it was learned that the Continental system was being installed at Woodgate.
In addition, the plaintiff complains that DeSimone, as principal operating partner of the Woodgate, Complexes, had interfered with AMSAT's refinancing with Philips Credit Corporation, its financing banker, by refusing to sign consent to assignment letters in accordance with Philips' required documentation. This refusal was despite the fact that Woodgate had signed such consent letters in the past. Such documentation and consent forms, according to the plaintiff, were required to be executed by the defendants under the provisions of their contract. As a result of this refusal, AMSAT's overall refinancing was reduced by the dollar value loss of Woodgate subscribers in the approximate amount of $200,000.
As another basis for the motion to find the defendants in contempt, the plaintiff complains that because of the possibility of signal interference from the overbuilding of one system on the other within the exclusive easement granted to AMSAT, the assignable value and salability of the plaintiff's system was eviscerated. In addition, the location of the Continental's system within that exclusive easement physically interferes with AMSAT's service to its customers. In support of this claim, the plaintiff presented evidence from an officer and engineer of AMSAT that once Continental Cable began installation of its cable system, the value of the AMSAT system was substantially diminished. The testimony from the company's engineer, Kenneth Makowski, was to the effect that the overbuilding of Continental's lines on Amsat system would impact on the signal quality.
 II.
The contract between the plaintiff and the defendants purported to grant AMSAT a form of exclusive right to operate a cable television system in the defendant complexes, to wit:
16. Exclusivity
 In consideration of the substantial costs and expenses incurable by Operator under this Agreement and the business risks attendant upon the venture which is a new and CT Page 2185 fledgling business at the Property, Owner warrants that no other pay or cable television programming, other cable-related service of any kind, including but not limited to security service, will be distributed or permitted to operate in, at, on or about the Property during the term of this Agreement unless and until (i) the Operator is granted a right of first refusal by Owner upon the same terms and conditions as Owner is willing to accept from a third party to furnish such services to the Owner, and (ii) Operator has rejected such option of first refusal by written notice to that effect sent to the Owner 30 days next following Operator's receipt of a written notice setting forth in detail all of the terms and conditions which the Owner is prepared to accept for the rendering of such services by such other party.
When the offer from Continental to install a system in the complexes for a premium to the defendants of $800.00 per customer was secured by DeSimone, it was presented to the plaintiff for purposes of first refusal. The plaintiff refused to act on the offer claiming it was illegal in that, by statute, a franchised operator could not offer nor could a landlord demand or accept payment for the installation of a cable system in an apartment complex. That was the way General Statutes Sec.16-333a appears to have read at the time. The statute has since been amended to permit such payment to a landlord as might be allowed by the Connecticut Department of Public Utility Control (DPUC).
To describe the contract provision as giving the plaintiff an exclusive right to operate a cable system in the complexes during the term of the contract is somewhat chimerical, since it would appear that the clear meaning of the paragraph is that the plaintiff could exclude the entry of a competitor only by meeting any legitimate offer made by the competitor.
Moreover, the DPUC has taken the position, in its enforcement of General Statutes Sec. 16-333a, that a franchised cable operator cannot be excluded from serving a multiunit apartment complex, even if there exists, between the landlord and a non-franchised cable company, a contract to service the apartment complex similar to the plaintiff's present contract.
The statute reads, in relevant part:
 16-333a. Availability of Service. Duties of Building Owners and Others. Extra Charge or Discrimination Prohibited. Right to Use Antenna.
(a) No owner of any multiunit residential building shall CT Page 2186 demand or accept payment, in any form, except as provided in subsection (e) of this section, in exchange for permitting community antenna television service on or within his property or premises, or discriminate in rental charges or the provision of service between tenants who receive such service and those who do not, provided such owner shall not be required to bear any cost for the installation or provision of such service.
 (b) An owner of a multiunit residential building shall permit wiring to provide community antenna television service to such building provided that: (1) A tenant of such building request community antenna television services; (2) the entire cost of such wiring is assumed by the community antenna television company; (3) the community antenna television company indemnifies and holds harmless the owner for any damages caused by such wiring; and (4) community antenna television company complies with all rules and regulations of the department of public utility control pertaining to such wiring.
On May 10, 1989, the State of Connecticut Department of Public Utility Control (DPUC) issued a declaratory ruling concerning the "exclusion," by the operators of the complex, of a franchised cable operator, Dimension Cable Services, from the Summitwood multiunit apartment complex in Meriden. The complex operators claimed the franchise cable company could not be permitted to install its service because there was an exclusive agreement with AMSAT Cable Limited Partnership III to provide cable television service. The contract between AMSAT and the operators of the Summitwood complex was essentially the same as that between the present plaintiff and defendants.
The DPUC ruled that the provisions of the contract between AMSAT and Summitwood giving AMSAT the exclusive right to enter the complex and the exclusive right to provide cable television service were in violation of the spirit and purpose of General Statutes Sec. 16-333a (b), were in conflict with Sec. 16-333a
(b), and against public policy, and therefore, were unenforceable and void.
The DPUC stated: "State policy as expressed in Sec. 16-333a
is to ensure that residents of multiple unit residential buildings who request CATV service would not be denied access to CATV service by the refusal of a building owner to allow the franchised cable company to wire the premises. The Authority concludes that section 4a and 15 of the agreement, in that they purport to grant AMSAT the exclusive right to enter Summitwood and the exclusive right to provide pay television service, are in violation of both the spirit and purpose of the law." CT Page 2187
To AMSAT's claim that the DPUC lacked jurisdiction to issue a declaratory ruling because AMSAT is a satellite master antenna system rather than a community antenna system as well as because AMSAT is not a company regulated as a public service company and is solely under the jurisdiction of the F.C.C., the Authority stated it "does not seek in any way to limit, regulate or interfere with AMSAT's right to install or operate its cable system. Rather, the Authority is examining whether or not the company is affecting the ability of franchised CATV company to operate as expressly provided by both federal and state law.
The primary purpose of the temporary injunction was to prevent the defendants, and especially the defendants' operating principal, P. Gerald DeSimone, from aggressively interfering with AMSAT's financing and sales opportunities. It is too broad a reading of the temporary injunction to maintain that it was intended to prevent another cable company from providing service to the complexes. Such an entry by another company was within the contemplation of the contract's exclusivity provision, if a bona fide offer were made.
Moreover, this court must give deference to the interpretation of the statute by the agency required to enforce the statute. Eagle Hill Corporation v. Commission on Hospitals Health Care, 2 Conn. App. 68, 76, 476 A.2d 626-(1981). That ruling mandates even a reluctant landlord (which the defendants are not) to allow a franchised community antenna television company to install its service if any request for such service is made by any unit occupant. That the DPUC's ruling was meant to be applicable to all similar situations was established by subsequent decisions and publications of that agency (Defendants' Exhibits 21 and 22).
 III.
The plaintiff complains that the defendants have allowed Continental Cable to install its lines and other components of its system within the easement secured to it by the terms of the contract. This not only interferes with its opportunity to sell or finance plaintiff's system, but is a physical interference with the system.
Paragraph 4 of the contract reads:
4. Easement
 a. As part of the foregoing easements, Owner hereby grants to Operator and its successors and assigns an easement appurtenant to the Property and running with the land for the term of this Agreement and all renewals and extensions hereof for the installation, CT Page 2188 maintenance, operation, expansion, use, replacement and removal of the System. Without limiting the foregoing, the Owner grants to the Operator the right to enter upon the Property, erect, (subject to "1b" above), excavate, install, replace, maintain and use the System on the Property above or underground, in whole or in part, including but not limited to the erection of poles, the excavation of trenches, affixation of cable or equipment to buildings, and installation of the same above or behind the walls, drop ceilings, plenum basement, ducts, and foundations of buildings, and the trimming or removal of shrubs or trees. The easement herein granted shall be an exclusive easement and the Owner shall not permit any others to install anything through, upon or over, or use the easement for any purpose whatsoever. * Upon execution of this Agreement, Owner shall execute and deliver to Operator an instrument in recordable form furnished by Operator setting forth the easement granted in this Agreement for recording by the Operator. b. The parties acknowledge that the installation and operation of any telecommunications equipment, including coaxial cable within fifteen (15') of the foregoing easement (other than such equipment as is currently installed) may adversely affect the System and its operation. Owner therefore agrees that it will not, nor will it permit any installation or operation of any other telecommunications equipment within fifteen feet (15') of the foregoing easement.*
A marginal insertion reads:
* which causes or results in interference with the television signal being received by the System and being distributed to Subscribers at the Property.
The plaintiff has presented ample evidence that Continental has installed its cable system and appurtenant equipment within the easement and, in many cases, immediately adjacent to or over the plaintiff's system.
The plaintiff's engineer, Kenneth Makowski, testified that there was interference with AMSAT's signal quality as a result of the installation and that there would be substantial interference with the signal quality if Continental's system were activated, from electrical leakage. However, the plaintiff was unable to establish any actual interference with the its signal as a result of the installation and the evidence concerning future signal degradation and interference should CT Page 2189 Continental's system be activated was conjectural. This is especially so in light of the testimony of James Kersnowski of Continental, that his company maintains such a parallel and overbuilt system in Massachusetts, where two parallel systems run independent 40 channel programming without significant problems.
The defendants maintain that the installation of the Continental system is not a breach of the provisions of 3 paragraph 4 of the contract because the asterisked insertion — * which causes or results in interference with the television signal being received by the System and being distributed to Subscribers at the Property — only prohibits the installation of telecommunication equipment which actually causes interference. The court agrees with the understanding of the plaintiff's principal, Richard Perrone, that the phrase was inserted at the request of the defendants to allow them to install lighting, alarm systems, and other non-cable programming electronic systems within the easement. That the defendants allowed the installation of the Continental system within the easement appears to be a breach of the agreement by the defendants.
However, the temporary injunction was not designed to deal with every, or even any, possible breach of the contract by the defendants. The breach has already occurred. Continental has installed its cable. Continental is not a party to this action, was not a party subject to the temporary injunction, and therefore, is not within the reach of the temporary injunction. Moreover, the DPUC has, in effect, licensed Continental to install its cable within the easement, even were the defendants actually amenable to an order directing the removal of Continental's cable or directing Continental not to activate its system while within the easement area.
To AMSAT's claim, in the Summitwood proceedings, that its easement is on private land and runs with the land, the Authority responded: "The Authority does not view AMSAT's claim regarding private easements so narrowly. According to the Cable Act, at 47 U.S.C. § 541 (b), Dimension's Certificate is construed to include the construction and operation of a cable system through public rights of way and easements `dedicated to compatible uses.' This section of the Cable Act was intended to prevent property owners, by choosing to contract with an unfranchised SMATV operator for the exclusive use of their easements or rights-of-way, from denying residents their right to receive cable service from a licensed cable operator within its franchise area."
The DPUC further stated: "The Authority subscribes to the CT Page 2190 prevailing view in many states that use by cable operators of statutory public utility telephone and power easements over other types of property is `compatible' with the easement granted and that such easements extend to both public and private easements." The DPUC cited Centel Cable Television Co. of Florida v. Admiral's Cove Association, 835 F.2d 1359 (11th Cir. 1988) for that position.
While this court believes the DPUC has broadly read that case — which saw no unlawful taking from the landowner when a franchised cable company lays its lines within an easement which the landowner has already dedicated to regulated utility installations, such as telephone and electrical lines — in applying it to a private easement, the DPUC has nonetheless clothed this intrusion with the public policy cloak.
Primarily, then, because Continental is beyond the reach of the temporary injunction, despite its alleged complicity with the defendants in interfering with the plaintiff's business and business prospects, the court cannot grant the plaintiff's motion as it relates to the installation of Continental's system within the plaintiff's easement.
The plaintiff has complained that Mr. DeSimone, as principal operating partner of the Woodgate Complexes, had interfered with AMSAT's refinancing with Philips Credit Corporation, its financing banker, by refusing to sign consent to assignment letters in accordance with Philips' required documentation.
If this were a violation of the temporary injunction, the refinancing has been completed so any contempt order would be fruitless in forcing the defendants into compliance. Moreover, the plaintiff has claimed a criteria for measuring money damages in that, as a result of this refusal, AMSAT's overall refinancing was reduced by the dollar value loss of Woodgate subscribers in the approximate amount of $200,000.
Therefore the plaintiff has a more effective relief at law.
 IV.
The plaintiff has not established that the defendants, while possibly in substantial breach of the contract and possibly amenable to an action in damages, have violated the temporary injunction to the extent that this court can find the defendants in contempt.
The motion to find the defendants in contempt is therefore denied. CT Page 2191
NIGRO, J.