SALMON BROOK CONVALESCENT HOME, INC. v.
COMMISSION ON HOSPITALS AND HEALTH CARE

LOISELLE, BOGDANSKI, LONGO, PETERS and A. HEALEY, Js.

Argued December 14, 1978—decision released April 24, 1979

*William J. Clarke,* assistant attorney general,
with whom, on the brief, were *Carl R. Ajello,* attor-
ney general, and *Bernard F. McGovern, Jr.,* assist-
ant attorney general, for the appellant (defendant).

*Stephen E. Ronai,* with whom, on the brief, were
*Stephen W. Studer* and *Frederick P. Leaf,* for the
appellee (plaintiff).

ARTHUR H. HEALEY, J.   The plaintiff, Salmon
Brook Convalescent Home, Inc., hereinafter refer-
red to as Salmon Brook, is licensed by the state

department of health to operate a chronic and convalescent nursing home in Glastonbury. As a health care facility, it is also subject to regulation by the defendant commission on hospitals and health care, hereinafter referred to as the commission. General Statutes §§ 19-73a et seq.

Pursuant to General Statutes § 19-73i(b),[1] Salmon Brook made application to the commission for per-

---

[1] "[General Statutes] Sec. 19-73i. RATE-SETTING POWERS. . . . (b) Except with respect to any increase in rates or charges provided for in a budget approved under section 19-73o, whenever any hospital proposes to increase its per diem per patient room rate or rates or its aggregate special services charges per patient in an amount which would increase such rate or rates or charges by more than six per cent over a twelve-month period or ten per cent over a twenty-four month period or whenever any nursing home or personal care home proposes to increase its periodic room rates per patient or aggregate special services charges per patient in an amount which would exceed four per cent over a twelve-month period or six per cent over a twenty-four month period, such hospital, facility or home shall file a request for approval of such increase with the commission, in the form and manner prescribed by the commission by regulation, at least sixty days prior to the proposed date of increase. Said commission may approve, modify, or deny such rate increase request, with or without a public hearing thereon not less than ten nor more than thirty days after receipt of such request. Notice of such decision shall be given immediately to the hospital, facility or home by certified mail and to the public by publication in a newspaper having a circulation in the area affected. If such rate increase request is denied, modified or approved without a public hearing the applicant or any member of the public may request such a hearing not later than thirty days after the date of such decision, in which case the commission shall hold a public hearing. Any public hearing provided by this section shall be held not less than ten nor more than thirty days after receipt of the request for a rate increase or the request for a hearing by the applicant or a member of the public. Notice of the hearing shall be given to the hospital, facility or home by certified mail and to the public, by publication in a newspaper having a circulation in the area affected, at least one week prior to such hearing. Such hearing shall be held, at the discretion of the commission in Hartford or in the area served by such hospital, facility or home. The commission shall require from such hospital, facility or home such information, data, records, studies and evaluations as it considers necessary to determine the need for such increases. Such

mission to increase the per diem rate to private, self-paying patients residing at its facility, which patients were not receiving state support. In its deliberations on such an application the commission is required to take into consideration certain factors set out in General Statutes § 19-73k.[2] A public hearing on Salmon Brook's application was held before a panel of the commission, appointed pursuant to General Statutes § 19-73i (b). Salmon Brook appeared at that hearing and presented evidence in support of its application. Thereafter, the commission met, approved the report of the hearing panel and adopted the proposed findings and order

proposed increases shall take effect thirty days after such hearing or thirty days after the receipt of any data requested by the commission, whichever is later, unless within such period the commission denies the requested increase or approves such percentage of the increase as the commission feels is justified. If no hearing is held or requested said commission's decision shall take effect thirty days after the date of such decision. . . ."

[2] "[General Statutes] Sec. 19-73k. CONSIDERATIONS IN COMMISSION DELIBERATIONS. AVAILABILITY OF INFORMATION. (a) In its deliberations under any of sections 19-73i to 19-73o, inclusive, the commission shall take into consideration the necessary expenses of the institution or facility concerned, its teaching and research expenses, its community service programs, comments received from Professional Standards Review Organizations regarding its volume, the need for preservation of capital and segregation of grants, its patient mix, the growth of its patient load, its accounts receivable experience, the effectiveness of its delivery of health care services, the quality of available health care, the duplication of service by institutions and facilities in the area served, the community or regional need for any particular function or service, and any other factors which the commission deems relevant, including, in the case of a facility or institution as defined in subsection (c) of section 19-576, such factors as, but not limited to, the business interests of all owners, partners, associates, incorporators, directors, sponsors, stockholders and operators and the personal backgrounds of such persons.

(b) Any data submitted to or obtained or compiled by the commission with respect to its deliberations under section 19-73i to 19-73o, inclusive, with respect to nursing homes, licensed under chapter 367, shall be made available to the department of health services and the board of licensure of nursing home administrators."

of that panel as its own finding and order. This resulted in a denial by the commission of Salmon Brook's application for rate increases of approximately 10 percent in each of several categories while granting rate increases under the application that amounted to approximately 2 percent. The panel report, which the commission accepted, included the following relevant items in its "Summary of Evidence":

" . . .

(3) The 1978 projected owner's salary is $33,000.

(4) The application includes salaries for owners in the following areas:

A. Plant Operation – Maintenance –         $6,494
B. Laundry and Linen                      –         5,886
C. Housekeeping                           –         1,120
D. Administration                         –        33,000

(5) The application includes salary for the Nursing Director of $30,906."

The panel further made the following findings of fact: "In evaluating the evidence, the panel concludes that this facility has owner salaries in excess of guideline amounting to $13,500. In addition, the owner's life insurance cost is not to the benefit of the home and is excessive compensation to the owners in the amount of $8,112. The guideline for nursing director salary is exceeded by $15,000. The total expense disallowance is $36,612. This excess profit amounts to $51,165 or $2.31 per patient day."

Thereafter, Salmon Brook appealed the commission's decision to the Court of Common Pleas. That court sustained the appeal on the ground of illegal use of "guidelines" as rules. Reasoning that where

a rule has substantial impact upon the rights and obligations of the parties who may appear before the agency in the future, the court found that the three rate-setting "guidelines" were indeed substantive rules since they establish conduct or standards which the agency is to apply to future adjudications on nursing home rate increases. In sustaining the appeal the court concluded that "the three guidelines, namely, the 7% gross revenue rule, the owner's compensation rule and the nursing directors' salary rule, are invalid as being unlawful regulations not promulgated in accordance with the rule-making provisions of the UAPA [Uniform Administrative Procedure Act]. The decision of the Commission in this case rendered on July 26, 1977, is void and of no effect, having been rendered in violation of statute, upon unlawful procedure, and in excess of the statutory authority of the agency." It therefore ordered the case remanded to the commission for further proceedings, as set out in the remand, including the direction that the application be considered "without reliance upon or application of the three above-named 'guidelines.'"

The sole assignment of error by the appellant commission is that the court erred "[i]n holding that the guidelines used by the defendant Commission on Hospitals and Health Care were applied as invalid, unpromulgated regulations not adopted in accordance with the provisions of Chapter 54 of the Connecticut General Statutes (Uniform Administrative Procedure Act)."

The commission is a state administrative agency created in 1973 by Public Act No. 73-117 upon a legislative finding "that the mutual interest of the state and the administrators and trustees of health care

institutions and facilities within the state . . . for the provision of health care to our citizens and the control of the costs of such health care creates a need for a partnership to provide for the effective promotion of such interest." General Statutes § 19-73a. Its composition, powers and duties are set out in chapter 334a of the General Statutes, §§ 19-73a et seq. It is subject to the provisions of the Uniform Administrative Procedure Act, hereinafter referred to as the UAPA, General Statutes §§ 4-166 et seq. Section 19-73i concerns the commission's rate-setting powers over facilities and institutions subject to its regulation. Section 19-73k sets out the considerations the commission is required to include in its deliberations in exercising its rate-setting powers as well as other powers given to it.

The UAPA provides that the term "regulation" means "each agency statement of general applicability that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency. The term includes the amendment or repeal of a prior regulation, but does not include (1) statements concerning only the internal management of any agency and not affecting private rights or procedures available to the public, or (2) declaratory rulings issued pursuant to section 4-176, or (3) intra-agency or inter-agency memoranda." General Statutes § 4-166 (7). The UAPA prescribes a statutory method for the adoption, amendment or repeal of any regulation. General Statutes §§ 4-168, 4-169, 4-170, and 4-172. The commission makes no claim, nor could it on the record in this case, that this procedure laid down by the UAPA was followed in this case. Rather, in addition to asserting that "the use of guidelines, not formalized into regulations, was not error per se by

the Commission," it claims that "the real test as to whether or not guidelines are illegal is not in their existence, but in how they are used." Such statements meet the critical issue on this appeal obliquely. The central issue is: Were the so-called "guidelines" actually used as "regulations" as that term is defined by the UAPA?

The commission claims that the "guidelines" were not used as "regulations" as that term is defined and as they are required to be promulgated under the UAPA. The determinant, however, is not semantical. "[T]he label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact. See *Columbia Broadcasting System, Inc.* v. *United States,* 316 U.S. 407, 416, 62 S. Ct. 1194, 86 L. Ed. 1563 (1942)." *Lewis-Mota* v. *Secretary of Labor,* 469 F.2d 478, 481–82 (2d Cir. 1972). See the concurring opinion in *Greenfield Construction Co.* v. *Michigan Department of State Highways,* 402 Mich. 172, 212, 261 N.W.2d 718 (1978); *In the Matter of Sturman* v. *Ingraham,* 52 App. Div. 2d 882, 885, 383 N.Y.S.2d 60 (1976). Where a rule has a substantial impact on the rights and obligations of parties who may appear before the agency in the future, it is a substantive rule, i.e., a "regulation" requiring compliance with the UAPA. See *Texaco, Inc.* v. *Federal Power Commission,* 412 F.2d 740, 744 (3d Cir. 1969); *Lewis-Mota* v. *Secretary of Labor,* supra. Therefore, we look to what the use of the "guidelines" in fact did in this case.

The court below concluded "from an examination of the record and the various exhibits, particularly with respect to the Commission's consistent application of the 7% gross revenue rule, the owners' com-

pensation rule and the nursing directors' salary rule in other Section 19-73i (b) adjudications, that the Commission improperly employed unpromulgated regulations in its proceedings in this case." Such an examination leads us to accept that conclusion. Use of the "guidelines" has determined rights and obligations of Salmon Brook and of others in the past and will have a substantial impact on the rights and obligations of those who may appear before the commission in the future. The commission decided to formulate "guidelines" against which they evaluated applications by those subject to their regulatory powers. Decisions utilizing the "guidelines" were consistently made by the commission. This was admittedly done without following the UAPA. The power of an administrative agency to prescribe rules and regulations under a statute is not the power to make law, but only the power to adopt regulations to carry into effect the will of the legislature as expressed by the statute. *Commonwealth* v. *DiMeglio,* 385 Pa. 119, 124, 122 A.2d 77 (1956) ; see *Volunteer Firemen's Relief Assn.* v. *Minehart,* 425 Pa. 82, 89, 227 A.2d 632 (1967). The commission then has a delegated discretion, which, to be properly exercised, where it has binding consequences, must obey the statutory commands of the UAPA. The commission was thus granted broad rule-making authority by the legislature's delegating to it some considerable segment of its legislative authority. See *United States* v. *Frontier Airlines, Inc.,* 563 F.2d 1008, 1012 (10th Cir. 1977). The nature and impact of these "regulations" characterized as "guidelines" required that the commission's legislative authority exercised under them be done only after conforming with the UAPA.

The UAPA provides that the agency shall give notice of its intended action prior to the adoption, amendment or repeal of any regulation and also provides for hearings and adoption procedures. General Statutes § 4-168. Such provisions were enacted not only to give the public an opportunity to participate in the rule-making process but also to enable the agency promulgating the rule to educate itself before establishing regulations which have a substantial impact on those regulated. *Texaco, Inc.* v. *Federal Power Commission,* supra; *Pacific Coast European Conference* v. *United States,* 350 F.2d 197, 205 (9th Cir.), cert. denied, 382 U.S. 958, 86 S. Ct. 433, 15 L. Ed. 2d 362 (1965). The opportunity required by statute for public input into the rule-making process contemplated by the UAPA was effectively foreclosed by the use of the "guidelines" by the commission. What the court said in *Texaco, Inc.* v. *Federal Power Commission,* supra, bears repeating here. In discussing 5 U.S.C. § 553[3] that court said: "Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing

---

[3] The following is the relevant statutory language: "[5 U.S.C.] § 553. RULE MAKING. . . .

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to . . . general statements of policy . . . or

rules and procedures which have a substantial impact on those regulated." *Texaco, Inc.* v. *Federal Power Commission,* supra, 744.

The recent case of *Blue Cross of Maryland, Inc.* v. *Franklin Square Hospital,* 277 Md. 93, 352 A.2d 798 (1976), involved the striking down of "guidelines" as illegal regulations and is remarkably apposite in the health care cost case before us. In *Blue Cross* certain hospitals challenged portions of regulations governing hospital rate applications promulgated by the Maryland Health Services Cost Review Commission. In a lower court determination in *Blue Cross* that was not attacked, that court held that the "guidelines" of the Maryland commission were rules and regulations which were not adopted and promulgated pursuant to the applicable Maryland law and were, therefore, invalid and of no effect. Interestingly, the definition of "rule" under the Maryland Administrative Procedure Act to which *Blue Cross* refers resembles our definition of "regulation" in General Statutes § 4-166 (7). The Annotated Code of Maryland, article 41, § 244, provides that " 'Rule' includes every regulation, standard or statement of policy or interpretation of general application and future effect, including the amendment or repeal thereof, adopted by an agency, whether with or without prior hearing, to implement or make specific the law enforced or administered by

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in the rules issue) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. . . ."

it or to govern its organization or procedure, but does not include regulations concerning only the internal management of the agency and not directly affecting the rights or procedures available to the public." Md. Ann. Code, art. 41, § 244. Maryland law also required notice to be published by the adopting agency, prior to the adoption of any rule authorized by law or its amendment or repeal, of its intended action. Md. Ann. Code, art. 41, § 245. *Blue Cross* emphasizes the requirement for conforming to prescribed procedures where rule-making takes place.

A recent New York case in the health care area has struck down the application of a "guideline" as actually being a rule or regulation that was illegally designed. *In the Matter of Sturman* v. *Ingraham*, 52 App. Div. 2d 882, 383 N.Y.S.2d 60 (1976), the defendant commissioner of health for New York State had denied the plaintiff's application to construct and operate a ninety-bed health-related facility as a physical addition to a nursing home. In reversing the commissioner's denial as arbitrary, requiring a rehearing and new determination, the appellate court in *Sturman* said that "[i]t is manifest that the guideline applied by the commissioner in rejecting petitioner's application had not been filed with the Secretary of State as 'rules' or 'regulations' are required to be. . . . In our opinion, insofar as appears from this record, the commissioner denied petitioner's application by applying to it that which the commissioner calls a mere 'guideline,' but which was in fact a rule or regulation which should have been previously filed in accordance with the above-cited constitutional and statu-

tory provisions.[4] *In the Matter of Sturman* v. *Ingraham,* supra, 884–85. In nullifying the commissioner's determination, which employed the "guideline," the court pointed out that the record disclosed that the petitioner's application "was denied not on the basis of the commissioner's review of the facts and merits of her application, but on the basis of applying to her application a preset, rigid, numerical policy (not contained in the statute) which foredoomed the application." Id., p. 885.

There is no warrant for the agency to replace the statutory scheme with rule-making procedures of its own invention. See *National Labor Relations Board* v. *Wyman-Gordon Company,* 394 U.S. 759, 764, 89 S. Ct. 1426, 22 L. Ed. 2d 709 (1969). In *Swalbach* v. *State Liquor Authority,* 7 N.Y.2d 518, 166 N.E.2d 811 (1960), the New York Court of Appeals held that the general policy of the state liquor authority of disapproving every application for removal of a package store to a "modern shopping center" is unreasonable and invalid. In that case the court said the agency must deal with applications case by case, appraising the facts as each application is submitted, and the agency may not avoid the duty imposed upon it of exercising a sound discretion in each case by adopting an all-

---

[4] In *Sturman* the court referred to the definition of "rule" as set out in section 101 (a) of New York's Executive Law entitled "Legislative notification of the proposed adoption, amendment, suspension or repeal of agency rules." *In the Matter of Sturman* v. *Ingraham,* 52 App. Div. 2d 882, 884, 383 N.Y.S.2d 60 (1976). That section states: "Definitions. As used in this section . . . b. 'Rule' means the whole or part of each agency statement of general applicability or regulation or code that implements or applies law, or prescribes the procedure or practice requirements of any agency, including the amendment, suspension or repeal thereof, except such as relates to the organization or internal management of the agency." *In the Matter of Sturman* v. *Ingraham,* supra, 884.

encompassing shopping center "policy" for, by so doing, it forecloses consideration of the various factors that the legislature intended be taken into account in reaching a decision. Ibid.

It is true that the modern tendency is liberal in approving delegation under broad regulatory standards so as to facilitate the operational functions of administrative boards or commissions. *Mitchell* v. *King,* 169 Conn. 140, 142, 363 A.2d 68 (1975); *Forest Construction Co.* v. *Planning & Zoning Commission,* 155 Conn. 669, 679, 236 A.2d 917 (1967); annot., 92 A.L.R. 400, 410. This court has already determined, however, that the UAPA "was intended to be a uniform guide to all agency action." *McDermott* v. *Commissioner of Children & Youth Services,* 168 Conn. 435, 440, 363 A.2d 103 (1975). The commission's failure to follow the required procedure acutely dramatizes the substantial impact of such a practice in the case of Salmon Brook. Salmon Brook's rights and the issues before the commission on the application were disserved by the choice not to follow the UAPA. That the so-called "guidelines" were "regulations" is patent. They were applied as substantive rules. Their use has a substantial impact upon those regulated by the commission who file applications such as the Salmon Brook application.

There is no error.

In this opinion the other judges concurred.