[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
By Appeal dated August 16, 2000, the plaintiffs Truro Associates, LLC ("Truro"), St. James Associates, LLC ("St. James"), George Finley ("Finley"), John F. Droney ("Droney"), and Peter Kelly ("Kelly") commenced this action appealing from the issuance of a Declaratory Ruling by the State Ethics Commission.
By agreement of the parties, the facts which formed the basis of the declaratory ruling were to be hypothetical and were not investigated or corroborated by the Commission. Thus, the facts connected with this Appeal are essentially undisputed. The defendant stipulated to the fact as set forth in the Plaintiff's Petition for Declaratory Ruling and the Exhibits attached thereto. On or about November 24, 1999, all of the plaintiffs submitted a Petition For Declaratory Ruling pursuant to Connecticut General Statutes § 4-176 and Regulations of Connecticut State Agencies Section 1-92-39 (a), concerning the applicability of Connecticut General Statutes § 1-99 (a), which provides, in relevant part:
 The Commission may impose a civil penalty on any person who knowingly enters into a contingent fee agreement in violation of subsection (b) of Section 1-97
or terminates a lobbying contract as a result of the outcome of an administrative or legislative action. The civil penalty shall be equal to the compensation which the registrant was required to be paid under the agreement".
Specifically, the plaintiffs asked the Commission to rule on the following questions: CT Page 16373
 1. Does § 1-99 (a) of the Connecticut General Statutes permit imposition of a civil penalty of more than Two Thousand ($2,000.00) Dollars against a person who (I) knowingly enters into a contingent fee agreement, (2) knowing that the activity which is required under the contract is lobbying activity, as defined under Connecticut General Statute 1-91, and (3) who further knows that the entering into of the contingent fee agreement violates section 1-97 (b) of the Connecticut General Statutes?
 2. Does Section 1-99 (a) of the Connecticut General Statutes permit imposition of a civil penalty of more than Two Thousand ($2,000.00) Dollars against a person who (1) knows that he is entering into a contingent fee agreement, and (2)(a) knows that the services required are lobbying services as defined under Connecticut General Statute § 1-91, but (b) does not know that said conduct violates Section 1-97 (b) of the Connecticut General Statutes?
 3. Does Section 1-99 (a) of the Connecticut General Statutes permit imposition of a civil penalty in excess of Two Thousand ($2,000.00) Dollars per violation permitted under Connecticut General Statutes § 1-99 against a person who (a) knowingly enters into a contingent fee agreement (b) did not intend to provide services which would be defined as lobbying services under Connecticut General Statue 1-91, (c) did not believe that he was providing such services, and (d) did not believe that he was violating Section 1-97 (b), or intend to violate said Section?
 4. Does Connecticut General Statute § 1-99 (a) permit the imposition of a civil penalty in excess of Two Thousand ($2,000.00) Dollars for knowingly entering into a contingent fee agreement against anyone other than the party to the contingency fee agreement?
 5. Does Section 1-99 (a) of the Connecticut General Statutes permit the imposition of a civil penalty of no more than Two Thousand ($2,000.00) Dollars against a person who enters into a contingent fee agreement without knowing at the time of entering into the CT Page 16374 agreement that the services called for by the agreement would violate Connecticut General Statute § 1-97 (b)?
 6. Does Section 1-99 (a) of the Connecticut General Statutes require that in order for the imposition of a civil penalty in excess of Two Thousand ($2,000.00) Dollars, the person entering into a contingent fee agreement within the parameters of Connecticut General Statute § 1-97 (b) must know that the required services under the contingent fee agreement are lobbying services as defined by § 1-91 at the time of entering the contingent fee agreement?
On or about January 7, 2000, the Commission issued a notice granting the Petition, and setting the matter down for a hearing. A hearing on the Petition for Declaratory Ruling was held before the Commission on June 16, July 7, and July 26, 2000.
The facts underlying the Petition and the Commission's Declaratory Ruling are based upon two underlying transactions between the State of Connecticut Office of the Treasurer and two venture capital investment firms, IAI Ventures, Inc. and Crescendo III, L.P. Former Treasurer Christopher Burnham determined to invest certain assets of the State's pension fund holdings with IAI Ventures. In a separate and wholly unrelated transaction, former Treasurer Paul Silvester determined to invest certain other assets of the State's pension fund holdings with Crescendo.
Truro is a limited liability corporation formed under the laws of the State of Connecticut. Truro's President is plaintiff George Finley. Peter Kelly and John Droney are partners in Truro.
On August 14, 1997, Truro executed a written agreement with IAI Ventures, Inc. Under this agreement, Truro was obligated to assist IAI Ventures, Inc. in identifying a limited number of large financial institutions as potential members of IAI World Fund in exchange for a fee contingent upon the amount of the State's investment in IAI's fund. The contract entered into between Truro and IAI Ventures Inc. specifically forbids Truro from engaging in any attempts to explain, sell, or even recommend the investment.
On December 27, 1994, Finley received a legal opinion from Attorney Paul McCormick, interpreting Connecticut General Statutes § 1-94, as amended by Public Act 94-69, to extend the lobbyist registration requirement to administrative action or non-action relating to a CT Page 16375 contract. Attorney McCormick opined that Finley's business activities in assisting venture capital firms in identifying large financial institutions, including State Treasurers, as potential investors in large funds, did not constitute lobbying and thus, were exempt from the registration requirement imposed under Public Act 94-69.
Before making any inquiries of Treasurer Burnham Truro obtained an opinion from a nationally renowned expert in securities law compliance concerning the actions required to comply with state and federal securities law. Attorney Richard Kraut advised Truro that it could not engage in the (1) sale, solicitation of offers, recommendations of a security to an investor, (2) provision of advice to investors, or (3) negotiations with prospective buyers, and that it could have no involvement in the investments, and that any fees received by Truro as a result of its activities must be disclosed to the Treasurer in writing.
In 1997, Finley, on behalf of Truro, asked then Treasurer Christopher Burnham if the Treasurer's office was interested in investing in venture capital investments. Treasurer Burnham stated that the Treasurer's Office was interested in both direct and indirect venture capital transactions. Finley told Treasurer Burnham of the existence of IAI Ventures Inc. Treasurer Burnham indicated that he would be interested in meeting the principals of IAI Ventures Inc.
Thereafter, Finley set up and attended a meeting between IAI Ventures Inc. and the Treasurer's office. Finley did not provide any investment advice to the Treasurer, and did not engage in any sales conduct involving the securities. Negotiations which ultimately led to the State's investment in the fund were conducted by IAI Ventures Inc., the Treasurer, their attorneys, and the office of the Attorney General. Neither Finley, Kelly, nor Droney participated in any manner in either the explanation of the investment product nor the negotiations of the terms of the State's participation in the Fund.
The Office of the Treasurer, acting through Treasurer Bumham and his investment committee, conducted a due diligence investigation of both IAI Ventures Inc. and the proposed investment. Truro did not participate in the closing of the fund transaction.
Neither Finley nor Truro registered with the Ethics Commission as a lobbyist. However, as set forth below Truro did disclose the fees it received from IAI Ventures, Inc. in writing with the Office of the Treasurer.
After months of negotiations between the Office of the Treasurer and IAI Ventures Inc., in which none of the plaintiffs had any involvement, CT Page 16376 the Office of the Treasurer entered into a written agreement to invest in the IAI Venture fund. The Office of the Treasurer agreed in writing that no representations or warranties were made to the State other than those set forth in the Offering Memorandum, the Partnership Agreement and the Subscription Documents.
On August 15, 1997, Truro filed an unsolicited and voluntary disclosure of the type and amount of its fee under the IAI Ventures, Inc. contract in writing with the Office of the Treasurer. On August 15, 1997, the Office of the Treasurer acknowledged, in writing, that it had received the unsolicited and voluntary written disclosure statement filed by Truro.
St. James is a limited liability company formed under the laws of the State of Connecticut, still in existence. The president of St. James is plaintiff George Finley. John Droney is a partner in St. James. St. James, through its president, George Finley, entered into a contractual agreement with Crescendo Ventures III, LLC and Crescendo Venture Management, LLC (hereinafter referred to jointly as "Crescendo") concerning the Crescendo III, LP Fund (the "Fund") that was almost identical to Truro's agreement with IAI Ventures. The contract between St. James and Crescendo expressly limited the role of St. James to identification of institutional funds which might be interested in investing in the securities offered and sold by Crescendo, in exchange for a fee contingent upon the amount of the State's investment in Crescendo's fund.
Like the agreement between Truro and IAI Ventures, Inc., the agreement between St. James and Crescendo was characterized by Mr. Finley as a "solicitation agreement." It contained the same prohibitions on engaging in securities work as the agreement between Truro and IAI Ventures.
After entering into the agreement with Crescendo, Mr. Finley and Mr. Droney inquired of then Treasurer Paul Silvester as to whether the Treasurer's Office was interested in investing in Crescendo. After determining that the Treasurer was interested, Mr. Finley and Mr. Droney set up a meeting between the Treasurer and the principals of Crescendo that resulted, following further negotiations, in an agreement by the Treasurer's Office to invest in the Crescendo III, LP Fund. St. James voluntarily filed an unsolicited disclosure with the Office of the Treasurer describing the type and amount of the fee it would receive.
Attorney Ralph Elliot, an expert in the field of ethics and the law, testified at the hearing that in his opinion, based on the facts set forth above, neither Truro, St. James, nor any of the individual Plaintiffs were lobbyists, or engaged in lobbying within the meaning of CT Page 16377 § 1-91 (k). They were, therefore, exempt from the registration requirements that state law imposes on lobbyists. Mr. Elliot concluded that "none of the [plaintiffs] communicated or caused others to communicate with any public official for the purpose of influencing any administrative action within the meaning of General Statutes § 1-91
(a)."
John A. Speziale, former Chief Justice of the Connecticut Supreme Court, provided a sworn and uncontested affidavit that in his opinion the conduct described in the facts set forth above and adduced before the Commission did not constitute lobbying. In addition, former Chief Justice Speziale opined that the evidence revealed that the plaintiffs did not know, and had no reason to know, that these limited contacts with the Treasurer's Office might be construed as lobbying.
In a ruling dated July 27, 2000, the Commission concluded that the hypothetical set of facts presented in the plaintiffs' petition constituted "lobbying" for purposes of § 1-97 (b) and that anyone who engaged in such conduct, after knowingly entering into a contingent fee agreement, would be subject to a civil penalty in excess of $2,000.00 regardless of whether he or she knew that the conduct constituted a violation of § 1-97 (b).
Discussion of Law and Ruling
At oral argument the plaintiffs requested the court to find aggrievement and the court found that the plaintiffs were aggrieved. The defendant has not contested that the plaintiffs have a specific personal and legal interest that has been specially and injuriously affected by the decision of the Commission. Local 1303 Local 1378 v. FOIC,191 Conn. 173, 176, 463 A.2d 613 (1983).
Section 4-175 of the Connecticut General Statutes provides that a plaintiff may seek in the Superior Court a declaratory judgment concerning the applicability of a provision of the General Statutes to the legal rights of the plaintiff, which rights may be threatened or impaired by actions or proposed actions of a state agency. Here the plaintiff's appeal from the declaratory ruling issued by the State Ethics Commission concerning the applicability to the plaintiffs of certain provisions of the State Lobbying Code, namely Connecticut General Statutes §§ 1-91
(a), 1-91 (k), 1-97 (b), and 1-99 (a), which provide as follows:
 Sec. 1-91 (k) "Lobbying" means communicating directly or soliciting others to communicate with any official or his staff in the legislative or executive branch of government or in a quasi-public agency, for CT Page 16378 the purpose of influencing any legislative or administrative action.
 Sec. 1-91 (a) "Administrative action" means any action or nonaction of any executive agency of the state with respect to the proposal, drafting, development, consideration, amendment, adoption or repeal of any rule, regulation or utility rate, and any action or nonaction of any executive agency or quasi-public agency, as defined in section 1-79, regarding a contract, grant, award, purchasing agreement, loan, bond, certificate, license, permit or any other matter which is within the official jurisdiction or cognizance of such an agency.
 Sec. 1-97 (b)No person shall be employed as a lobbyist for compensation which is contingent upon the outcome of any administrative or legislative action.
 Sec. 1-99 (a) The commission, upon a finding made pursuant to section 1-93 that there has been a violation of any provision of this part, shall have the authority to order the violator to do any or all of the following: (1) Cease and desist the violation of this part; (2) file any report, statement or other information as required by this part; or (3) pay a civil penalty of not more than two thousand dollars for each violation of this part.
 The commission may prohibit any person who intentionally violates any provision of this part from engaging in the profession of lobbyist for a period of not more than two years. The commission may impose a civil penalty on any person who knowingly enters into a contingent fee agreement in violation of subsection (b) of section 1-97 or terminates a lobbying contract as the result of the outcome of an administrative or legislative action. The civil penalty shall be equal to the amount of compensation which the registrant was required to be paid under the agreement.
In an appeal from an agency final decision under the Administrative Procedure Act, the court's "ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its orders, acted unreasonably, arbitrary, illegally, or in abuse of its discretion."Dolgner v. Alander, 237 Conn. 272, 280-81, 676 A.2d 865 (1996). While the CT Page 16379 court should afford deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes,
 Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference." (Internal quotation marks omitted.) Connecticut Light Power Co. v. Texas-Ohio Power, Inc., 243 Conn. 635, 642, 708 A.2d 202 (1998).
Macdermid, Inc. v. Dept. of Environmental Protection, 257 Conn. 128,137, 778 A.2d 7 (2001).
The foregoing statutes have not previously been the subject of judicial scrutiny. Therefore, this court must make an independent evaluation as to their meaning and reach of the statutes in issue.
In interpreting the meaning of a statute, the court must attempt to determine the intent of the legislature as expressed by the common and approved usage of the words in the statute. Town of Winchester v.Connecticut State Bd. of Labor Relations, 175 Conn. 349, 350, 402 A.2d 332
(1978). Before employing legislative rules of interpretation to resolve an ambiguity in a statute, the court must first determine that an ambiguity exists. Where language is clear and unambiguous, its meaning is not subject to modification by construction. Thibeault v. White,168 Conn. 112, 115, 358 A.2d 358 (1975). Words in a statute must be constmed according to the commonly approved usage of the language.Thibeault, op. cit. 116.
In order for a person to be engaged in "lobbying" within the meaning of Connecticut General Statutes § 1-91 (k) the person must have ". . . communicate[d] with any official or his staff in legislative or executive branch of government . . . for the purpose of influencing any legislativeor administrative action . . ." As the definition makes clear, a person does not engage in lobbying unless the purpose of the communication is to influence administrative action.
Section 1-91 (a) of the Connecticut General Statutes defines "Administrative action" to mean ". . . any action of any executive agency . . . regarding a contract, grant, award, purchasing agreement, loan, CT Page 16380 bond . . . or any other matter which is within the official jurisdiction or cognizance of such agency."
The plaintiffs urge the court to construe 1-91 (k) such that lobbying means communication for the purpose of directly influencing the action of an executive agency. They argue, in effect, that the communication must have some qualitative or evaluative content. In this case such communication by the plaintiffs would have consisted of an overt request to the Treasurer's office to invest with either IAI or Crescendo. The record does not contain any evidence that the plaintiffs made any such overt request. In addition, the contract between Truro and IAI specifically forbids Truro from engaging in any attempts to explain, sell, or even recommend the investment. The contract between St. James and Crescendo contains a similar prohibition.
The plaintiffs also argue that a phone call to the Treasurer's office to set up a meeting, and the attending of a meeting falls within an exception to the definition of "lobbying" contained in the Ethics Commission Regulations. Section 1-92-42a(e) of the Ethics Commission's regulations provides that certain activities do not require registration as an administrative lobbyist. Among the activities listed are "ordinary and customary communications made to the agency, or a related entity, including, but not limited to, communications made incident to the performance of a contract," Reg. Conn. State Agencies, Ethics Commission, § 1-92-42a(e)(2), and "contacts with an executive branch or quasi-public agency, whether formal or informal, for informational purposes, including, but not limited to, the application of that agency's rules, regulations, or statutes to a specific fact situation, regardless of whether the contact is initiated by the private party or the agency (e.g. request by an individual for an advisory opinion or declaratory ruling from the Ethics Commission, or request by an agency for product or client information from a regulated industry)." Reg. Conn. State Agencies, Ethics Commission, § 1-92-42a(e)(3).
The defendant argues, in essence, that the statutory definition of "lobbying" includes conduct which indirectly influences executive agency actions. Thus, it argues that an introductory phone call and meeting without any other contact is "lobbying" because the ultimate purpose of such conduct was to cause the Treasurer's investment with IAI and Crescendo. Since the Treasurer did ultimately invest with those entities, the argument goes, even though the plaintiffs did not recommend the investment, or make any other qualitative statements about IAI or Crescendo, they have engaged in lobbying.
The defendant has characterized the plaintiffs' conduct as "door opening" and has ruled that door opening constitutes lobbying. This ruling CT Page 16381 is based in large part on the defendant's reliance on one of its own advisory opinions, Advisory Opinion No. 95-11. In Advisory Opinion No. 95-11, the Commission was asked to interpret the terms "Representative of a Manufacturer" and "Salesperson" as those terms are used in regulation promulgated by the Commission, Regulation of Connecticut State Agencies. § 1-92-42b. The Commission was asked whether high-level corporate officers who interact with the State could be considered salespersons. The Commission was not asked, and did not need to decide, whether any of the individuals were lobbyists or had engaged in lobbying. Instead, after concluding that the individuals were engaged in lobbying, the Commission determined that the exemptions to lobbying for manufacturer's representatives or sales persons did not apply. Without citing to Public Act 94-69 or to its legislative history, the Commission ruled:
 One of the fundamental purposes behind the expansion of the definition of administrative lobbying was to regulate the "door opening" which takes place when an individual becomes involved, on behalf of a client, in the State contracting process.
This statement cited to no legislative history, did not define what is meant by "door opening", and did not explain what is meant by involvement in the state contracting process. Yet the defendant relied on it in this case to support its claim that the plaintiffs engaged in lobbying.
The plaintiffs argue that the Commission's Declaratory Ruling in this case was based on the Commission's improper attempt to enforce its advisory opinion as a regulation that has not been properly adopted.Salmon Brook Convalescent Home v. Commission on Hospitals and HealthCare, 177 Conn. 356, 363, 417 A.2d 858 (1979). Section 4-168 of the Connecticut General Statutes sets forth in substantial detail the procedure which an agency must follow if it wishes to adopt a regulation. A "regulation" is defined, in Conn. Gen. Stat. Section 4-166 (13), as
 each agency statement of general applicability, without regard to its designation, that implements, interprets, or prescribes law or policy. . . . The term includes the amendment or repeal of a prior regulation, but does not include (A) statements concerning only the internal management of any agency not affecting private rights or procedures available to the public, (B) declaratory rulings issued pursuant to Section 4-176, or (C) intra-agency or interagency memoranda.
The Commission claims that its reliance on its prior interpretations of CT Page 16382 the statutes are permissible under Sweetman v. State ElectionsEnforcement Comm., 249 Conn. 296, 732 A.2d 144 (1999). In Sweetman the Supreme Court stated:
 "The criteria that determine whether administrative action is a `regulation' are neither linguistic nor formalistic. . . . The test is, rather, whether `a rule has a substantial impact on the rights and obligations of parties who may appear before the agency in the future.' Salmon Brook Convalescent Home, Inc. [v. Commission on Hospitals Health Care, 177 Conn. 356, 362, 417 A.2d 358 (1979)]." (Citations omitted.) Maloney v. Pac, 183 Conn. 313, 325-26, 439 A.2d 349 (1981). "This does not mean . . . that every administrative decision which may have precedential significance beyond the facts and party before it becomes ipso facto a regulation. Eagle Hill Corp. v. Commission on Hospitals Health Care, 2 Conn. App. 68, 76, 477 A.2d 660 (1984). Instead, "administrative agencies must necessarily interpret statutes which are made for their guidance," and they may do so without reference to regulations. Connecticut Life Health Ins. Guaranty Assn. v. Jackson, 1573 Conn. 352, 356, 377 A.2d 1099 (1977). "To rule otherwise would be to ignore the subtle and intricate interaction of law and fact. It is inherent in our judicial system of dispute resolution that the interpretation of statutes, like the development of the common law, grows out of the filtering of a set of facts through the law, as seen by the administrator or judge. The result of this application is a hybrid, composed in part of fact, in part of law, which by its existence contributes to the interpretation of a statute." Id., 356-57.
249 Conn. at 317.
As the Court in Sweetman stated, not every Agency interpretation of a statute constitutes a regulation. However, the plaintiffs correctly point out that the Commission's advisory opinions are binding only on the Commission. The advisory opinions are merely the Commission's prior interpretations of the statutes in question. Prior interpretations do not give the Commissions interpretations in this case any added validity. It remains for the court to determine whether those interpretations comport with the intent of the legislature. CT Page 16383
Section 4-176 (a) of the Connecticut General Statutes provides, in pertinent part:
 Any person may petition an agency . . . for a declaratory ruling as to . . . the applicability to specified circumstances of a provision of the general statutes. . . .
The plaintiffs argue that the Commission has avoided its responsibilities under under Section 4-176, and instead has intentionally and improperly argued that this court should rule against the plaintiffs because they are "individuals with connections to highly placed governmental officials" who "used their connections to help others secure government contracts . . .
The court agrees that the Commission's version of the evidence has added facts not set forth in the Petition. The Petition contained no facts articulating either that the plaintiffs are highly connected individuals or that they used any connections to help secure government contracts. The Petition makes clear that at no time did any of the plaintiffs (1) provide advice to either Treasurer; (2) attempt to do anything to effect the purchase of any securities by either Treasurer; (3) participate in any negotiations; (4) in any way effectuate any transactions with either Treasurer. The Petition alleges only that the plaintiffs identified an opportunity and made inquiries for informational purposes. It further alleges that the Treasurer's Office acknowledged in writing "that no representations or warranties were made to the State other than those set forth in the Offering Memorandum, the Partnership Agreement, and the Subscription Documents."
The court must determine whether the a telephone call to set up an informational meeting, and attending that meeting constitutes lobbying within the meaning of Connecticut General Statutes § 1-91 (a) and regulation § 1-92-42a(e)(2). The court holds such conduct is not "lobbying" because it did not constitute "communicating directly . . . with any official or his staff in the . . . executive branch of government . . . for the purpose of influencing any . . . administrative action." This holding is based on the ordinary meaning of the language of the statute. Communicating for the purpose of influencing implies some sort of evaluative or qualitative statement in favor of the administrative action. This holding is also based on the exception to the definition of "lobbying" contained in regulation § 1-92-42a(e)(2), under which "contacts with an executive branch or quasi-public agency, whether formal or informal, for informational purposes,. . . . regardless of whether the contact is initiated by the private party or the agency" (emphasis added) do not constitute lobbying. CT Page 16384
Finally this court's interpretation of § 1-91 (a) as applied to the facts alleged in the Petition is based on Public Act 00-43, which provides, in pertinent part:
 No person may, directiy or indirectly, receive a finder's fee in connection with any investment transaction involving the state . . . or any political subdivision of the State.
Conn. Gen. Stat. Section 3-131 (a). (emphasis added). The Act defines a "Finders Fee" to include:
 compensation in the form of cash, cash equivalents or other things of value paid to or received by a third party in connection with an investment transaction to which the state . . . is a party for any services, and includes, but is not limited to, any fee paid for lobbying, as defined in subsection (k) of Section 1-91, and as defined by the Ethics Commission, in consultation with the Treasurer, in the regulations adopted under subparagraph (c)(ii) of subdivision (3) of this subsection. . . .
Conn. Gen. Stat. Section 3-131 (b)(1). (emphasis added).
As Public Act 00-43 and its legislative history strongly suggest, before the enactment of Public Act 00-43 making inquiries of the Treasurer and setting up a meeting did not constitute lobbying.
The definition of "Finder's Fee" as adopted by the legislature precludes the receipt of any fee, contingent or otherwise, for any activity, lobbying or otherwise, performed in connection with any state investment. The Statute is quite specific in using the language ". . . includes, but is not limited to, lobbying. . . ." Therefore, it appears that the legislature intended to encompass within the ban on finder's fees any activity which did not previously rise to the level of lobbying. Under the new law the activities of the plaintiffs in making inquiries and setting up a meeting are now prohibited, but as they were not made for the purpose of influencing administrative action under the prior law, they were not previously prohibited. Conn. Agencies Reg.1-92-42-(a)(e)(3) removed from the definition of lobbying "contacts with an executive branch or quasi-public agency, whether formal or informal, for informational purposes." Since persons performing those acts were not lobbying, the ban on contingency fees did not apply. CT Page 16385
Now, however, a person may not receive a finder's fee for performing those same acts if done in connection with investment services. In order to fully explicate what acts would preclude the payment of a finder's fee, the new legislation requires the adoption of new regulations.
The legislative history of Public Act 00-43 confirms that "door opening" and "finder's fees" were not illegal prior to the passage of that Public Act. Ethics Commission Executive Director, Alan Plofsky, argued against passage of the legislation:
. . . the timing of this legislation could not be worse. . . . [B]y the end of this month we will have 12 complaints formally filed. . . . These complaints involve the very issues of finder's fees. . . . [I]t . . . could be an impediment to our investigation.
(Hearings before the Finance, Revenue and Bonding Committee, pp. 000817-000818).
 We feel that what's commonly known as a finder's fee, which is a contingent fee for arranging business with the Treasurer's office is barred, is illegal and can be sanctioned by the Ethics Commission dollar for dollar.
(Comments before the Finance, Revenue and Bonding Committee, March 14, 2000, p. 000819).
The legislature obviously disagreed, for if the then-existing legislation contained such a ban, there would have been no reason to pass Public Act 00-43. In this new law the legislature has created a category of illegal activity, prohibiting the payment of a finder's fee for what the defendant has called door-opening.[1]
The declaratory ruling here was based on the Commission's conclusion that the plaintiffs' hypothetical conduct did constitute lobbying. As stated above, this court does not agree with that conclusion because it was based on an incorrect interpretation of § 1-91. Since the plaintiffs did not engage in administrative lobbying, then for any of the six questions posed by the plaintiffs to the Commission the court concludes that 1-99 (a) does not permit imposition of any civil penalty and sustains the Appeal, and directs the Commission to answer the six questions posed to it as follows:
1) Yes, assuming lobbying occurred; CT Page 16386
2) No;
3) No;
4) No;
5) No;
6) Yes.
This court will address the Commission's interpretation of Connecticut General Statutes § 1-99 (a) because that interpretation is not dependent on the Commission's interpretation "lobbying" under § 1-91.
The Commission's answers to questions 1, 2, 3, 5 and 6 were all based upon its conclusion that § 1-99 (a) required that
 for the Commission to impose a civil penalty "equal to the amount of compensation the registrant was required to be paid" two findings are required: 1. that the person knowingly entered into a contingent fee agreement; and 2. that the agreement is in violation of § 1-97 (b).
This court concludes that the foregoing is an erroneous interpretation of the law. See Connecticut General Statutes § 4-183 (j). Section 1-99
(a) provides, in pertinent part:
 The Commission may impose a civil penalty on any person who knowingly enters a contingent fee agreement in violation of subsection (b) of Section 1-97 or terminates a lobbying contract as the result of the outcome of an administrative or legislative action. The civil penalty shall be equal to the amount of compensation which the registrant was required to be paid under the agreement.
Before the Commission may impose the penalty of complete forfeiture it must find, based upon a preponderance of record evidence, that a person (1) knowingly entered into a contingent fee agreement, and (2) knowingly violated § 1-97 (b).
Section 1-99 (a) contains penalties for both knowing violations of the law and unintentional violations of the law. The Commission may impose a penalty of two thousand dollars against any person upon a finding that there has been a violation of any provision of the lobbying code, CT Page 16387 intentional or unintentional. Connecticut General Statutes § 1-99
(a)(3). This provision contains no requirement that the violation be "knowing".
The penalty of forfeiture, conversely, applies only to those instances in which any person knowingly enters into a contingent fee contract in violation of Section 1-97 (b). Section 1-97 (b) does not forbid all contingency fee contracts, only those which involve the provision of lobbying services. Thus, the plain reading of the statute leads to the conclusion that the legislature intended to provide the extreme penalty of forfeiture only in those cases in which a person knowingly enteredinto a contract to provide lobbying services which was contingent innature. The essence of the violation is that a person entered into a contract to provide lobbying services which was contingent, not that the person entered into a contingent fee contract. Entering into a contingent fee contract is not illegal; it is only when the person knows that this contract is for lobbying services that the additional penalty of forfeiture applies.
The foregoing interpretation of the statute is supported by the rules of statutory construction, the definition of the terms used in the statute, the nature of the statute, and the practical effect of the interpretation.
In interpreting the meaning of a statute, the court must attempt to determine the intent of the legislature as expressed by the common and approved usage of the words in the Statute. Town of Winchester v.Connecticut State Bd. of Labor Relations, 175 Conn. 349, 350, 402 A.2d 332
(1978). Before employing legislative rules of interpretation to resolve an ambiguity in a statute, the court must first determine that an ambiguity exists. Where language is clear and unambiguous, its meaning is not subject to modification by construction. Thibeault v. White,168 Conn. 112, 115, 358 A.2d 358 (1975). Words in a statute must be construed according to the commonly approved usage of the language.Thibeault, op. cit. 116.
The forfeiture penalty may only be applied in those situations in which a person knowingly enters into a contingent fee contract in violation of Section 1-97, or terminates a lobbying contract as the result of the outcome of an administrative or legislative action. The term "knowingly" is defined in Webster's Third Edition New International Dictionary as "in a knowing manner; with awareness, deliberateness or intention." Black'sLaw Dictionary 7th Edition defines "knowing" and "knowingly" as "(1) having or showing awareness or understanding; well informed, (a knowing waiver of the right to counsel). (2) deliberate; conscious. Webster'sNinth New Collegiate Dictionary defines "knowing" and "knowingly" as CT Page 16388 "having or reflecting knowledge information or intelligence. Finally, Connecticut General Statutes § 53a-3 (12) provides: "A person acts "knowingly' with respect to conduct or to circumstances described by a statute defining an offense when he is aware that his conduct is of such a nature or that such circumstances exist."
The Commission has no power to discipline a person who enters into a contingency fee contract which has nothing to do with lobbying. Under the power vested in the Commission under § 1-99 (a)(3) the Commission may issue a two thousand dollar penalty against a person who unknowingly engages in lobbying. However, under the clear meaning of the statute, the Commission cannot impose a forfeiture unless the violation of the ban on contingency fee lobbying was knowing. "When the words of a statute are plain and unambiguous, we need look no further for interpretive guidance because we assume the words themselves express the intention of the legislature." In re Corey E., 40 Conn. App. 366, 370 671 A.2d 396
(1996).
Courts must apply legislative enactments in accordance with their plain terms. State v. Maim, 143 Conn. 462, 467, 123 A.2d 276 (1956). By placing a construction on a statute that is contrary to plain and unambiguous text, a court would encroach on that which is solely reserved to the legislature. In the field of legislation, the legislature is supreme. If rules of interpretation are applied to an unambiguous Statute, the likelihood of erroneous interpretation is significantly increased. R. Williams Statutory Construction in Connecticut; An Overview andAnalysis, 62 Conn. B.J. 307, 343 (1988).
The Commission mistakenly concluded that a person need know only that he was entering into a contingency fee contract in order for the penalty of forfeiture to apply. Under this interpretation of the statute the term "knowing" would modify only the term "contingency fee contract," and would make the phrase "in violation of subsection (b) of Section 1-97" mere surplusage. Under the Commission's analysis, anyone who enters into a contingent fee contract has committed a violation. It is impossible to envision a situation in which a person would not know that the contract entered into was contingent. To adopt the Commission's interpretation would, therefore, render the word "knowing" meaningless.
The Commission's interpretation of the statute ignores not only the plain meaning of the words, but also the lack of punctuation between the phrases. The sentence which permits the imposition of a forfeiture contains no commas setting off "knowing" from "in violation of subsection (b) of Section 1-97." The absence of such punctuation setting off the limiting phrase "in violation of subsection (b) of Section 1-97" from "contingency fee" clearly demonstrates that the adverb "knowing" is CT Page 16389 adjunctive, modifying the entire phrase. Had the legislature wished to limit the "knowing" requirement to the act of entering into a contract, rendering the adverbial phrase disjunctive, the insertion of a comma between the phrases would be necessary.
Punctuation is a recognized aid to statutory construction. State v.Dennis, 150 Conn. 245, 248, 188 A.2d 65 (1963). When the legislature fails to insert a word, or a punctuation which would render a phrase disjunctive, thereby separating that phrase from the modifying words; the Supreme Court has relied on the grammatical structure to interpret the legislative intent. State v. Payne, 240 Conn. 766, 605 A.2d 525 (1997). The lack of disjunctive punctuation mirrors the legislative intent of requiring both that the fee agreement be contingent and that the services provided be lobbying services. If either of the two elements of this violation are not present, there is no violation of § 1-97 (b), and no penalty can be imposed. Emerick v. Kuhn, 52 Conn. App. 724, 737 A.2d 456
(1999); Simko v. Zoning Bd of Appeals of Town of Fairfield, 206 Conn. 374,376, 538 A.2d 202 (1988).
Section 1-99 is a penal statute. The citizens of this country have a common law right to seek to petition their government by lobbying.Article I, Section Fourteen of the Constitution of the State ofConnecticut provides "The citizens have a right, in a peaceable manner to assemble for the common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address, or remonstrance." In addition, the right to contract has long been embraced in the concept of liberty under the due process clause. Brazo v. Real Estate Commission, 177 Conn. 515, 525,418 A.2d 883 (1979). Restrictions on a common law right are viewed as penal in nature, and must be strictly construed. Dental Commission v.Tru-Fit Plastics, Inc., 159 Conn. 362, 365, 269 A.2d 265 (1970).
Restrictions on the right to contract are a constitutional exercise of the police power. The Connecticut Supreme Court has repeatedly stated that these penal Statutes must be strictly construed. Dental Commissionv. Tru-Fit Plastics, Inc., op. cit (exercise of police power designed to serve public health penal in nature, conduct or acts proscribed must be sufficiently explicit to meet constitutional requirements); Bailey v.Kozlowski, 167 Conn. 493, 356 A.2d 114 (1975) (Motor vehicle dealers license restrictions penal in nature); Fitzpatrick v. Commissioner ofMotor Vehicles, 165 Conn. 416, 334 A.2d 476 (1973); Altholtz v.Connecticut Dental Commission, 4 Conn. App. 307, 493 A.2d 917 (1985);Brazo v. Real Estate Commission, 177 Conn. 515, 418 A.2d 883 (1979) (broker's license); Cantor v. State Board of Electrical Examiners,3 Conn. App. 707, 492 A.2d 194 (1985) (by defining the situations in which a contractor's license might be revoked, and by providing for aCT Page 16390fine for violations, statutes are penal in nature, and must be strictly construed); Alvarez v. New Haven Register Inc., 249 Conn. 709, 735 A.2d 306
(1999).
A penal statute must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties. Brazo v. Real Estate Commission, 177 Conn. 515, 526, 418 A.2d 883
(1979); Altholtz v. Connecticut Dental Commission, 4 Conn. App. 307,313, 493 A.2d 917 (1985); Amsel v. Brooks, 141 Conn. 288, 297, 106 A.2d 152
(1954).
The Commission found that § 1-99 (a) is "not unambiguous." If there is an ambiguity, that ambiguity cannot be used to expand the reach of the law, and must be construed in favor of those subject to the imposition of the forfeiture.
Furthermore, the conclusion that § 1-99 (a) can only be sensibly interpreted if a person must "knowingly" provide lobbying services in order to violate its provisions is buttressed by both the fact that a penalty for unknowing violations of the provision is available under the same section of the same statute. The Ethics Code permits the Commission to impose a penalty of up to $2,000.00 for violations of the Code which are not knowing. It does not make sense to think that the legislature permitted the imposition of a recoupment penalty under the same standard. A nonsensical meaning cannot be attributed to the statute. Shelby MutualIns. Co. v. Della Gehelfa, 3 Conn. App. 432, 438, 489 A.2d 398 (1985). The Court cannot extend the statute by implication to create liability which no language of the act purports to create. State v. Roque190 Conn. 143, 151, 460 A.2d 26 (1983); Cantor v. State Bd. of ElectricalExaminers, 3 Conn. App. 707, 712, 492 A.2d 194 (1985). An ambiguous penal statute cannot be constitutionally read in an expansive manner to create liability where none clearly exists.
Contrary to the Commission's argument, the plaintiffs have not pled ignorance, and have not acted in total disregard of the law. Rather, the undisputed evidence before the Commission was that plaintiffs considered whether their conduct violated the law; were provided with, and relied upon, a legal opinion that their conduct did not violate the statute; reported the entirety of their conduct to the Banking Commission and the Treasurer's office, and were assured that they acted appropriately.
As set forth above, the legislature's passage of Public Act 00-43 leads to the conclusion that prior to that Public Act, it was at least unclear, even to the legislature, that "door opening" for a fee constituted lobbying. Therefore, the plaintiffs could not have knowingly violated the prohibition against contingent fee lobbying. CT Page 16391
Question Four of the Petition asked:
 Does Connecticut General Statute § 1-99 (a) permit the imposition of a civil penalty in excess of Two Thousand ($2,000.00) Dollars for knowingly entering into a contingent fee agreement against anyone other than the party to the contingency fee agreement?
The defendant answered this question in the affirmative. The statutory interpretation employed by the Commission to arrive at that answer was truly procrustean.
Section 1-99 (a) provides that "The Commission may impose a civil penalty on any person who knowingly enters into a contingent fee agreement. . . ." The term "person" is defined in § 1-91 (n) to include "an individual, a business, corporation, limited liabilitycorporation, union, association, firm, partnership, committee, club or other organization or other group of persons." The legislature obviously intended that the term "person," as used in § 1-99 (a), would be defined as set forth in § 1-91 (n). "Insofar as it is possible, the entire enactment is to be harmonized, each part made operative." Statev. Roque, 190 Conn. 143, 151, 460 A.2d 26 (1983). Section 1-99 (a) must be read in conjunction with § 1-91 (n), which sets forth the definition of the term "person" used in the Act.
The inescapable conclusion of reading those two provisions is that if a penalty of forfeiture is to be imposed under § 1-99 (a) for entering into a contingency fee contract, it can be imposed only against the "person" who entered into the contract.
 When the language used in a statute is clear and unambiguous, its meaning is not subject to modification by construction. State v. Simmons, 155 Conn. 502, 504, 234 A.2d 835; Hurlbut v. Lemelin, 155 Conn. 68, 73, 230 A.2d 36. It is not the function of courts to read into clearly expressed legislation provisions which do not find expression in its words; Lenox Realty Co. v. Hackett, 122 Conn. 143, 150, 187 A. 895; nor is it our function to substitute our own ideas of what might be a wise provision in the place of a clear expression of the legislative will. Connelly v. Bridgeport, 104 Conn. 238, 249, 132 A. 690. The statute must be applied as its words direct.
Dental Commission v. Tru-Fit Plastics, Inc., 159 Conn. 362, 365, CT Page 16392269 A.2d 265 (1970).
The Record facts before the Commission are unequivocal that only the limited liability companies — Truro and St. James — entered into the contingency fee contracts. The unambiguous terms of Section 1-99
(a) limit the forfeiture provision to the "person" who enters into the contingency fee contract. Since the term "person" is defined as including a limited liability corporation under § 1-91 (n), if only the limited liability corporation entered into the agreement, only the limited liability corporation is subject to the penalty of forfeiture.
The defendant has based its ruling that individuals who did not enter into a contingency fee contract may be subject to forfeiture by ignoring the statutory definitions and resorting to a convoluted analysis of "communicator lobbyists," "client lobbyists," and "business organizations." The defendant has conceded the following basis for such invalid analysis: permitting individuals to escape forfeiture liability "would read into exisiting law a broad regulatory loophole that would eviscerate the legislature's intent in adopting the Code of Ethics for Lobbyists." Brief of Defendant-Appellee at p. 37. The legislative intent of these statutes cannot be distorted to fit the Commission's idea of what the law should punish. Sometimes legislation contains loopholes. If the Commission believes that § 1-99 (a) contains a loophole and that liability under that statute should be expanded to encompass directors and officers of a corporation, or members of a limited liability company, the Commission should petition the legislature for a change in the law. Colli v. Real Estate Commission, 169 Conn. 445, 452, 364 A.2d 167
(1975). The Commission should not abuse its power to interpret the law in an attempt to make new law.
Connecticut law does recognize limited circumstances in which the separate identity of a corporation or limited liability company will be ignored. Those circumstances are limited to situations in which a finding of fraudulent, evasive or manipulative purposes is established in forming or maintaining the corporation. S.F.A. Folio Collections, Inc. v.Bannon, 217 Conn. 220, 585 A.2d 666 (1991). The corporate entity will be disregarded "only under exceptional circumstances, for example where the corporation is a mere shell, serving no legitimate purpose and is used primarily as an intermediary to perpetuate fraud or promote injustice."Id., citing Angelo Tomasso Inc. v. Armor Construction and Paving, Inc.187 Conn. 544, 557, 447 A.2d 406 (1982).
There was no evidence before the Commission which would have permitted the Commission to disregard the corporate entity of Truro or St. James under Angelo Tomasso, Inc. Therefore, there was no basis to find that any "person" other than Truro and St. James could be subject to the forfeiture CT Page 16393 penalty of § 1-99 (a). Accordingly, the Commission erred in failing to answer Question #4 "No".
For all the foregoing reasons the plaintiffs' appeal is sustained. The court concludes as a matter of law that (1) the evidence before the Commission establishes that plaintiffs did not engage in lobbying, or were exempt from lobbying; (2) the plaintiffs did not knowingly enter into a contingent fee agreement in violation of Section 1-97 (b); (3) if the forfeiture prohibition set forth in § 1-99 (a) did apply in this case, which it does not, it would apply only to Truro and St. James and not to the individual plaintiffs; and (4) a declaratory judgment should enter in favor of the plaintiffs.
By the court,
Aurigemma, J.